1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        CENTRAL DISTRICT OF CALIFORNIA

10

11  RANDOLPH SMALLS,                    )   NO. CV 03-3034-MAN
                                        )
12                     Plaintiff,       )
           v.                           )   MEMORANDUM OPINION AND ORDER
13                                      )
                                        )
14  JO ANNE B. BARNHART,                )
    Commissioner of the                 )
15  Social Security Administration,     )
                                        )
16                     Defendant.       )
    _____)

17

18       Plaintiff filed a Complaint on May 1, 2003, seeking review of the

19  denial by the Social Security Commissioner ("Commissioner") of

20  Plaintiff's claim for disability insurance benefits ("DIB").  On July 7,

21  2003, the parties filed a "Consent to Proceed Before a United States

22  Magistrate Judge," pursuant to 28 U.S.C. § 636.  The parties filed a

23  Joint Stipulation on February 10, 2004, in which:  Plaintiff seeks an

24  order reversing the Commissioner's decision and directing the payment of

25  benefits or, alternatively, remanding the case for a new hearing; and

26  Defendant requests that the Commissioner's decision be affirmed and this

27  action dismissed with prejudice.  The Court has taken the Joint

28  Stipulation under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his application for DIB on December 11, 1996. (Administrative Record ("A.R.") 160-62.) Plaintiff claims to have been disabled since August 2, 1995, due to back and leg impairments and related pain, as well as depression. (A.R. 16, 160, 183.) Plaintiff has past relevant experience as a truck driver, operating engineer/heavy equipment operator, and stage hand. (A.R. 16, 165, 228.)

The Commissioner denied Plaintiff's claim for benefits initially and upon reconsideration. On June 30, 1998, Plaintiff, who was represented by counsel, appeared and testified at a hearing before Administrative Law Judge Zane Lang ("ALJ Lang"). (A.R. 38-92.) On August 26, 1998, ALJ Lang remanded the case for the evaluation of Plaintiff's claimed mental impairment and the completion of a Psychiatric Review Technique form. (A.R. 130.) On October 5, 1999, Plaintiff, who was represented by counsel, appeared and testified at a supplemental hearing before Administrative Law Judge Sally Reason ("ALJ").[1] (A.R. 95-126.) In a March 10, 2000 written decision, the ALJ denied Plaintiff's request for benefits, and the Appeals Council subsequently affirmed the ALJ's decision. (A.R. 15-24, 4-5.)

---

[1] Plaintiff's counsel, who also represented Plaintiff at the October 5, 1999 hearing, asserts that the hearing transcript misidentifies the ALJ as Martha R. Reeves, rather than as Sally Reason. (*See* Joint Stip. at 3.) That contention appears to be correct. (*See* A.R. 15.)

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

**A.   <u>Plaintiff's Medical Evidence</u>**

With respect to Plaintiff's claimed physical impairments, the ALJ had before her records from Plaintiff's treating physician, Dr. Michael Roback, as well as other physicians to whom Plaintiff was referred, for the period from March 1996, to September 1999.  (A.R. 266-340, 381-82, 397-405.)  Dr. Roback's notes show that Plaintiff had hernia surgery in February 1996 (A.R. 310.)  In his initial report dated March 30, 1996, Dr. Roback found that Plaintiff suffered from "chronic, symptomatic, posttraumatic injury of the lumbar spine with lower lumbar musculotendino-ligamentous involvement," with "right and left posterior joint damage and suggestions of slight inter-vertebral disc deformity." (A.R. 313.)

In a December 5, 1997 letter, Dr. Roback stated that "[Plaintiff] will be unable to work for an indefinite period."  (A.R. 381.)  In another letter from the same date, Dr. Roback further explained that Plaintiff has had extensive treatment with minimal relief, and that "[i]t is apparent that [Plaintiff] will not be able to return to work[;] therefore, I am requesting that any and all financial provisions be made for him."  (A.R. 382.)

Dr. Roback's records from 1996 to 1998 also show that Plaintiff was using a TENS unit to treat his back injuries, and that he was taking Darvocet and Paraforte.  (A.R. 299, 334, 337, 339.)  In Dr. Roback's records from 1999, he noted that Plaintiff:  was benefitting from using

3

the TENS unit (A.R. 397, 399, 402-04); was experiencing no change in his condition and no new symptoms (A.R. 401); and was managing his pain by using the TENS unit and taking pain medication (A.R. 403-04).

In a January 21, 1997 report, Dr. Arthur Garfinkel, an orthopedic surgeon who examined Plaintiff at the request of the Commissioner, diagnosed Plaintiff with myeloligamentous strain of the lumbosacral spine, lumbar radiculopathy, and possible herniated nucleus pulposi. (A.R. 255.)   He found that Plaintiff "should be precluded from activities requiring occasional lifting or carrying greater than 35 [pounds], frequent lifting or carrying greater than 15 [pounds]" and "activities requiring frequent or repetitive bending, stooping, kneeling, squatting, climbing, crawling, and/or balancing." (*Id*.)

In a July 23, 1998 report, Dr. H. Harlan Bleecker, an orthopaedic physician who examined Plaintiff at the request of the Commissioner, diagnosed Plaintiff with chronic low back pain and degenerative disc disease at the L5-S1 level. (A.R. 345.)   Dr. Bleecker found that Plaintiff can "occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds" and "can stand, walk, and sit for six hours." (*Id*.)

In a November 17, 1998 report, Dr. Michael Shlens, an orthopaedic physician who examined Plaintiff at the request of the Commissioner, diagnosed Plaintiff with:   1) residuals of a lumbar sprain; 2) degenerative lumbar disc disease; 3) history of headaches; and 4) "[p]robable depressive reaction with musculoskeletal manifestation." (A.R. 371.)   Dr. Shlens found that Plaintiff should be restricted from

4

heavy lifting or repetitive bending or squatting. (A.R. 372.) Dr. Shlens further explained that Plaintiff "either [had] a depressive reaction or [was] grossly enlarging upon his condition," and suggested an additional psychological evaluation to investigate that issue. (A.R. 372.)

In a June 17, 1999 evaluation performed by Dr. Lawrence Feiwell for the Workers' Compensation Appeals Board, Dr. Feiwell diagnosed Plaintiff with degenerative disc disease at the L5-S1 level and chronic lumbar myofascial sprain-strain with possible radiculopathy. (A.R. 393.) Dr. Feiwell found that Plaintiff should be precluded from performing heavy lifting and repetitive bending and stooping. (A.R. 394.)

Plaintiff also submitted objective laboratory testing regarding his physical impairments. (*See* A.R. 245 -- September 11, 1995 x-ray of lumbar spine showing "[m]ild degenerative disc disease at the L5-S1 level"; 246 -- September 11, 1995 x-ray of S1 joints showing "[n]o abnormality"; 322-23 -- March 29, 1996 EMG of Plaintiff's right and left lower extremities, which was "normal" and showed "normal distal sensory [of] both sural nerves," but noting that such results "[did] not exclude the presence of a sensory radiculopathy"; 413 -- October 8, 1999 MRI of the lumbar spine, showing that, since Plaintiff's prior October 28, 1996 MRI, "there has been progression of the LS-S1 deteriorative disc level changes with new inferior L5 greater than superior S1 vertebral body fatty infiltration," and "the L5-S1 disc bulging now appears to be symmetric and along with disc space narrowing has crowded the exits of both L5 nerves.")

1    With respect to Plaintiff's claimed mental impairments, Dr. Jeffrey
2  Butler, a psychologist, stated in an October 4, 1999 letter that he had
3  first seen Plaintiff on June 11, 1998, upon the recommendation of
4  Plaintiff's counsel, and Plaintiff thereafter had weekly psychotherapy
5  sessions with him, which he recommended that Plaintiff continue.  (A.R.
6  407.)   In a Mental Assessment form completed on the same date, Dr.
7  Butler found that Plaintiff  was "moderately limited" in:  three areas
8  of understanding and memory; eight areas of sustained concentration and
9  persistence;  four  areas  of  social  interaction;  and  five  areas  of
10 adaptation.  (A.R. 408-11.)

11

12    In a July 23, 1998 report, Dr. Melanie Moran, a psychologist who
13 examined  Plaintiff  at  the  request  of  the  Commissioner,  diagnosed
14 Plaintiff with "[p]robable depression, not otherwise specified, mild
15 degree."  She noted that "[Plaintiff] does continue to interact with
16 others and can maintain fair focus," and his "[n]eurovegetative signs
17 are mild."  (A.R. 359.)  Dr. Moran further noted that:

18

19       [Plaintiff] does evidence mild cognitive and emotional
20       limitations regarding his ability to learn a simple repetitive
21       skill and adapt to minimal changes in the work environment.
22       He does report being quite withdrawn and did appear withdrawn
23       during the evaluation, to some extent.  This could affect his
24       overall ability to relate to others and to adapt to minimal
25       changes in the work environment.

26

27       [Plaintiff] is capable of learning a simple, repetitive
28       skill but may have some difficulty sustaining pace and focus.

1  [Plaintiff's] concentration and focus are mildly compromised
2  by what appears to be his discomfort level.

3

4  Reasoning capacities are concretely intact. [Plaintiff]
5  can remember and comply with simple one- and two-part
6  instructions. He does have more difficulty with details,
7  again due to some compromise in his concentration and focusing
8  ability. It is not felt that there is actual memory loss.
9  [Plaintiff] does not require personal supervision. He may
10 require some repetition, and may have difficulty maintaining
11 a regular schedule, again for the same reasons.

12

13 (A.R. 359-60.)

14

15 In a November 9, 1998 report, Dr. Richard Baker, a physician who
16 examined Plaintiff at the request of the Commissioner, diagnosed
17 Plaintiff with adjustment disorder with mixed anxiety and depressed
18 mood, and explained that this disorder was chronic and might be
19 characterized as mood disorder, not otherwise specified. (A.R. 367.)
20 Dr. Baker further noted that Plaintiff's depression "[stemmed] from
21 chronic pain and the financial and personal and social consequences of
22 his not being able to earn a living." (A.R. 367.)

23

24 The record also contains a December 29, 1998 Psychiatric Review
25 Technique form, completed by a state agency physician whose identity is
26 unclear, noting that Plaintiff's mental impairments were "not severe"
27 and that Plaintiff suffered from adaptive and mood disorders. (A.R.
28 373, 376.) The form further notes that: Plaintiff had only "slight"

7

restriction in his activities of daily living and in maintaining social functioning; Plaintiff would "seldom" experience deficiencies of concentration; and there was "insufficient evidence" to determine whether Plaintiff would experience episodes of deterioration or decompensation in daily living.  (A.R. 380.)

**B.    The ALJ's Decision**

At the June 30, 1998 hearing, ALJ Lang elicited testimony from: Plaintiff; Eric Henderson, a nurse who cares for Plaintiff's cousin at the residence where Plaintiff lives; and Freeman Leeth, a vocational expert.  (A.R. 38-92.)  At the October 5, 1999 hearing, the ALJ elicited testimony from both Plaintiff and June Hagen, a vocational expert.  (A.R. 93-126.)

In her March 10, 2000 decision, the ALJ found that Plaintiff met the disability insured status requirements on August 2, 1995, his claimed disability onset date, and continued to meet them through the date of her decision.  (A.R. 23.)  She found that Plaintiff had not engaged in substantial gainful activity since that onset date and was a "younger individual," pursuant to 20 C.F.R. § 404.1563, at the time of the decision, with more than a high school education.  (*Id.*)  She concluded that Plaintiff had "severe" musculoskeletal and emotional impairments, but did not have an impairment or combination of impairments listed in, or medically equivalent to an impairment listed in, Appendix 1, Subpart P, Regulation No. 4.  (*Id.*)

The ALJ determined that Plaintiff had the residual functional

capacity to perform "light" work with "no repetitive or frequent bending, stooping, squatting, climbing, crawling or balancing," and was "restricted to simple work."[2] (A.R. 23.) She found that Plaintiff's allegations "were not fully credible or reliable based upon the cumulative medical and lay record as analyzed herein." (*Id.*) The ALJ further found that Plaintiff was unable to perform his past relevant work and did not have any transferable skills, but could perform other jobs in the national economy, such as cleaner/housekeeper, packager, and electrode cleaner. (A.R. 24.) Accordingly, the ALJ concluded that Plaintiff was not entitled to DIB. (*Id.*)

## STANDARD OF REVIEW

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996). The Commissioner's decision must stand if it is supported by substantial evidence and applies the appropriate legal standards. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). Substantial evidence is "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995).

Although this Court cannot substitute its discretion for that of the Commissioner, this Court nonetheless must review the record as a

---

[2]   "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."   20 C.F.R. §§ 404.1567(b); 416.967(b).

whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." <u>Desrosiers v. Sec'y. of Health and Human Serv.</u>, 846 F.2d 573, 576 (9th Cir. 1988); *see also* <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039-40 (9th Cir. 1995). This Court must uphold the Commissioner's decision if it is supported by substantial evidence and free from legal error, even when the record reasonably supports more than one rational interpretation of the evidence. *Id.* at 1041; *see also* <u>Morgan v. Commissioner of the Soc. Sec. Admin.</u>, 169 F.3d 595, 599 (9th Cir. 1999); <u>Flaten v. Secretary</u>, 44 F.3d 1453, 1457 (9th Cir. 1995).

**DISCUSSION**

In a somewhat scattershot and cursory fashion, Plaintiff alleges that there are nine "disputed issues" requiring resolution in this action. Plaintiff's first stated "issue" simply asks the Court to consider the record "as a whole" (Joint Stip. at 4-5), a request that is unnecessary. The Court, as noted above, is aware of its duty to do so on review. Accordingly, the first "issue" is a non-issue and does not require additional consideration or resolution.

Plaintiff's remaining eight "issues" essentially fall into five categories. <u>First</u>, Plaintiff contends that the ALJ failed to evaluate his claimed pain, the side effects of his medication, and the testimony of a third party properly. <u>Second</u>, Plaintiff contends that the ALJ failed to evaluate properly the records of Dr. Roback, his treating

physician, and improperly rejected Dr. Roback's opinion that Plaintiff was "unable to work." <u>Third</u>, Plaintiff contends that the ALJ failed to develop the record and evaluate properly the evidence regarding his mental impairment and several physical conditions. <u>Fourth</u>, Plaintiff contends that the ALJ erred in two respects in finding that Plaintiff can perform work in the national economy and is not disabled. <u>Fifth</u>, Plaintiff contends that, because he was found to be disabled under a later decision of the Commissioner, the Court should assume that the ALJ decision in question was erroneous.

**A.   The ALJ's Consideration Of Plaintiff's Subjective Symptom Testimony Does Not Warrant Reversal.**

Plaintiff contends that the ALJ erred in finding Plaintiff's testimony as to his subjective symptoms to be not fully credible or reliable. More specifically, Plaintiff argues that the ALJ's analysis contained only general findings and relied simply on the conclusory assertion that Plaintiff's testimony was "vague." (Joint Stip at 6-7.) Plaintiff also complains that the ALJ failed to consider the side effects of his medications. (*Id.*) Plaintiff also contends that the ALJ did not properly consider the testimony provided by a third party, Eric Henderson, at the June 30, 1998 hearing before ALJ Lang. (*Id.*)

**1.   The Governing Standards**

In order to evaluate properly a claimant's pain and other symptoms and their effect on his ability to work, 20 C.F.R. § 404.1529(c)(3) provides that "other evidence," besides objective medical evidence,

11

shall be considered.  This includes such evidence as the claimant's testimony, statements by treating and nontreating sources, and observations by third parties.  Section 404.1529(c)(3) states that relevant factors to be considered include: daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his pain or other symptoms; treatment, other than medication, he receives or has received for relief of his pain or other symptoms; and any measures he uses or has used to relieve his pain or other symptoms.

Section 404.1529(c)(4) further provides:

> We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled.  We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be

12

accepted as consistent with the objective medical evidence and other evidence.

According to Social Security Ruling 96-7p: "Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence."

Case law further provides that, once a disability claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to cause some level of pain of the type which the claimant alleges, the claimant's subjective complaints regarding the severity of his or her pain may not be discredited based solely on a lack of objective medical evidence to corroborate the allegations. Tonapetyan v. Halter, 242 F.3d 1144, 1147-48 (9th Cir. 2001); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1985). As the Ninth Circuit has explained:

[A]n ALJ's finding that a claimant generally lacked credibility is a permissible basis to reject excess pain testimony. But, because a claimant need not present clinical or diagnostic evidence to support the severity of his pain, *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990)

13

(stating that "it is the very nature of excess pain to be out of proportion to the medical evidence"), a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain.

Light v. Social Security Admin., 119 F.3d 789, 792 (9th Cir. 1997).

Unless the evidence suggests affirmatively that a claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's excess pain or symptom testimony, such as conflicts between the claimant's testimony and conduct, or internal contradictions in the claimant's testimony. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Light, 119 F.3d at 792. In determining whether a claimant's testimony regarding the severity of his symptoms is credible, the ALJ may consider: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." Smolen, 80 F.3d at 1284.

The Court will give great weight to the ALJ's credibility assessment. Anderson v. Sullivan, 914 F.2d 1121, 1124 (9th Cir. 1990); Brawner v. Secretary, 839 F.2d 432, 433 (9th Cir. 1988)(recognizing that the ALJ's credibility determination is to be given great weight when supported specifically). However, when an ALJ's decision rests on a negative credibility evaluation, "the ALJ must make findings on the

14

record and must support those findings by pointing to substantial evidence on the record." <u>Cequerra v. Secretary</u>, 933 F.2d 735, 738 (9th Cir. 1991); <u>Oreteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995)(the ALJ's findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.")  When discrediting a claimant's testimony, it is not enough for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests that the complaints are not credible. *See* <u>Swenson v. Sullivan</u>, 876 F.2d 683, 688 (9th Cir. 1979).

## 2.   <u>The ALJ's Analysis</u>

In this case, in rejecting Plaintiff's claimed limitations and symptoms, the ALJ explained:

> The undersigned did not find [Plaintiff] to be fully credible
> or reliable.  [Plaintiff] was vague in some aspects of
> testimony.  He indicated that he had lumbosacral disc disease
> and that his left leg goes out on him.  He did not describe a
> specific medically credible pain dermatome.  [Plaintiff] made
> allegations which were inconsistent with other statements in
> the record.  For example, he testified that he could only sit
> for about 10 minutes, and stand for 1/2 hour, whereas he
> elsewhere indicated much greater capacities (e.g., Exhibit 4F,
> p. 43).  [Plaintiff] also did not seem totally familiar with
> his own situation, indicating that he did not know that
> surgery had been considered.  Further, [Plaintiff] indicated

15

that he was not currently being seen for his musculoskeletal concerns.  Apparently, he now takes Darvocet and Parafon 500. He indicated that medications help, though indicating some gastrointestinal upset as a side effect.  There was no indication of contemporaneous complaints about side effects. The record does, indeed, indicate that [Plaintiff] has availed himself of various conservative therapies, including acupuncture, physical therapy, transcutaneous nerve stimulator (TENS), etc.   The file references [Plaintiff's] acknowledgments that his symptoms are improved with medications or therapies (e.g., Exhibit 4F, p. 37, Exhibit 6F, p. 6).

In addition to the foregoing, the undersigned emphasizes that the various physicians of record have considered [Plaintiff's] subjective complaints in assessing or rating [his] disability status.  The weight of that opinion evidence clearly is that [Plaintiff] can perform a wide range of work. . . .[3]

While [Plaintiff] is seen by Dr. Butler for psychological problems, the record is devoid of significant psychiatric signs showing abnormalities in behavior, affect, thought, memory, orientation or contact with reality so as to support

_____

[3]   At this point, the ALJ briefly noted that, in his most recent report, Plaintiff's treating physician opined that Plaintiff cannot work.  As discussed in more detail in Section B, the ALJ adequately explained why she disregarded that ultimate conclusion by Plaintiff's treating physician.

a disabling mental component.   Further, [Plaintiff] is not taking any medications for depression or other emotional symptoms.

The undersigned also notes that [Plaintiff] was asked leading questions [by] counsel at the hearing and provided self-serving responses which did not come across to the undersigned as authentic or reliable.   [Plaintiff] did not make eye contact with the undersigned at the hearing when discussing his emotional status.

(A.R. 17-18.)

### 3.   The ALJ's Credibility Analysis Sufficed Under The Governing Standards Of Review.

As set forth above, the ALJ first found that Plaintiff's testimony was vague with respect to his failure to "describe a specific medically credible pain dermatome," his lumbosacral disc disease, and his claim that his left leg "goes out."   When asked by the ALJ to explain why he believes he cannot work, Plaintiff provided only a nonspecific, and exaggerated, response, stating:

Because I suffer a lot of pain in my left side from my foot up.   *It interferes with everything that I do daily*.   And my leg also gives out on me a lot, sometime I get a lot of pain in my right leg, but I'm suffering in my left side from my stomach all the way up to my back.

(A.R. 105; emphasis added.)

When Plaintiff's counsel attempted to obtain more specific testimony from Plaintiff, he was successful. When counsel asked Plaintiff how long he could sit without discomfort, Plaintiff equivocally responded: "It changes, it's different. Anywhere from moments to [a] half hour." (A.R. 107-08.) When counsel asked Plaintiff whether he had "any trouble standing," Plaintiff responded: "Yes, I can stand different, the pain is consistent, it's just going on. So, whenever there's irritation, then it's just more, I stand, I just got to do something else." (A.R. 108.) When counsel questioned Plaintiff as to his leg pain, which he claimed was "unbearable," Plaintiff described such pain as occurring on an intermittent and infrequent basis that could strike at any time, but failed to indicate where in his leg such overwhelming pain was occurring. (A.R. 109 -- "Sometime[s] just walking it [still] happens. I get a sharp pain and I got to come down to the floor [and] stay there until the pain goes away [and] there's nothing I can do.") When questioned by counsel about how often he walks and what distance he can walk before experiencing any problems, Plaintiff ambiguously responded: "Different things happen when I walk. [It] changes, if, if I walk a block I feel something, if it's, if it's pulling up in the front part of my stomach or if it's pulling up in my back or some down my legs just start numbing." (A.R. 108.) With respect to his lumbar impairment, when counsel asked Plaintiff whether he had problems lifting, bending, or raising his hands above his shoulders, Plaintiff simply responded that he did not lift or bend and that he had problems "doing anything" extending his arms, but did not describe whether these activities caused pain to a specific location of

18

his back or identify any pain in his back that precluded these activities.  (A.R. 108, 110.)

Thus, the ALJ's statement that Plaintiff's testimony regarding his lumbar problems and leg "going out" was vague in some aspects and not sufficiently specific in describing the origin or location of his pain is supported by substantial evidence and constitutes a clear and convincing reason for rejecting Plaintiff's testimony regarding his leg and lumbar pain and related limitations. *See e.g.*, Tonapetyan, 242 F.3d at 1148 (ALJ's reliance on, *inter alia*, claimant's tendency to exaggerate, was substantial evidence supporting his adverse credibility finding); Anderson, 914 F.2d at 1123-24 (ALJ properly found that the claimant lacked credibility based on his evasiveness).

The ALJ's determination that some of Plaintiff's testimony was inconsistent with his own statements and with other evidence of record also constituted a clear and convincing reason to find him not fully credible.  For instance, at the June 30, 1998 hearing, Plaintiff testified that he could walk for 15 minutes; he could stand 20 minutes; and he could stand longer than he can sit (*i.e.*, could sit for less than 20 minutes); however, at the October 5, 1999 hearing, he testified that he could sit for "moments to [a] half hour".[4]  (A.R. 59-60, 107-08.)  As

---

[4]     The Court notes that the ALJ slightly misstated Plaintiff's testimony at the hearing (*viz.*, stating that Plaintiff testified that he "could only sit for about 10 minutes, and stand for 1/2 hour." Regardless, as the ALJ's credibility finding is based on more than adequate reasons supported by substantial evidence, any slight misstatement in characterizing his claimed limitations, which were nevertheless inconsistent at different points in the record, is not grounds for reversing her credibility finding.  *See, e.g.*, Batson v. Commissioner of Social Security, 359 F.3d 1190, 1197 (9th Cir.

the ALJ pointed out, in March 1996, Plaintiff reported to Dr. Michael Roback, his treating physician, that he could walk 30 minutes and sit 50 minutes. (A.R. 308.) Significantly, Dr. Roback concluded that Plaintiff's condition already had become "permanent and stationary" nine months prior to that date. (A.R. 277.) Plaintiff testified in October 1999 that he cannot bend. (A.R. 108.) In June 1998, Plaintiff testified that he generally needs help getting up from laying down. (A.R. 54-55.) Yet, in a November 17, 1998 examination, Dr. Shlens observed that Plaintiff: was able to "[get] up and down from a recumbent position with no evidence of guarding or spasm" at his examination; had normal reflexes; and showed no motor deficits of the lower extremities. (A.R. 370-72.) Dr. Schlens also found that: Plaintiff's neurological components . . . are normal"; "there is no atrophy to correlate with his symptom complex"; and his claimed symptoms are the result of either "a depressive reaction" or he "is grossly enlarging upon his condition." (A.R. 371-72.) These inconsistencies in Plaintiff's own testimony and as compared to the objective medical evidence are proper bases for rendering an adverse credibility finding. *See* Morgan, 169 F.3d at 599-600 (ALJ properly relied on medical reports demonstrating inconsistencies in a claimant's symptoms in rejecting his credibility; Light, 119 F.3d at 792 (internal conflicts in claimant's statements are a proper basis for discrediting allegations regarding

---

2004)(even if ALJ committed some error in characterizing the claimant's statements regarding his limitations, such error was harmless, as the ALJ's credibility and residual functional capacity findings were grounded on more than substantial evidence). *See also* Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990) (ALJ's error in finding that the claimant had a high school diploma and was 50 years old was harmless because it did not affect the determination that the claimant was literate, able to communicate in English, and was "closely approaching advanced age").

20

limitations); *see also* <u>Thomas v. Barnhart</u>, 278 F.3d 947, 954, 959 (9th Cir. 2002)(ALJ properly rejected the claimant's credibility based in part on her exaggeration of pain in two physical examinations).

Aside from these factors, the ALJ appropriately found that Plaintiff's demeanor, such as his failure to make eye contact, and the nature of his testimony, which were self-serving responses to leading questions, indicated that his testimony was not reliable or authentic. *See* <u>Thomas</u>, 278 F.3d at 960 (ALJ appropriately based his rejection of the claimant's testimony on her demeanor at the hearing, noting that "she seemed to engage in considerable histrionic exaggeration"); <u>Sousa v. Callahan</u>, 143 F.3d 1240, 1243 (9th Cir. 1998)(an ALJ may "disregard self-serving statements made by claimants if it finds them to be incredible on other grounds"); <u>Bunnell</u>, 947 F.2d at 346 (ALJ may properly reject a claimant's credibility by using "ordinary techniques of credibility evaluation").

The Court has carefully reviewed Plaintiff's testimony at both hearings. Summarized fairly, Plaintiff testified that he suffers from "unbearable" pain and, as a result, has no daily activities of any kind. Plaintiff stated that he sleeps very little and spends his day alternating between periods of standing, walking, sitting, and laying down; he cannot bend or lift anything; he does not watch television or read; he does not cook and rarely eats; and he is simply existing. At times, he has laid on the floor for 24 hours and done nothing else, because he is scared to move. As Plaintiff put it, "I don't do nothing." (A.R. 51-52, 54-55, 57-61, 80-81, 107-11, 116-17.)

1    The ALJ's conclusion that this testimony was not consistent with
2    the medical evidence of record was legitimate.   While a claimant need
3    not present clinical evidence substantiating the severity of his pain,
4    the level of pain which Plaintiff claims, *i.e.,* essentially utter
5    incapacitation and a life akin to vegetation, is not that which
6    reasonably could be expected to flow from the objective medical findings
7    rendered by treating and examining physicians.   In this case, the ALJ
8    gave a detailed explanation of why she found Plaintiff not fully
9    credible and reliable, using illustrative examples.   Plaintiff's
10   contention that this equates to an improper "general" rejection of his
11   testimony is without merit.   *See* Tonapetyan, 242 F.3d at 1148.   The
12   ALJ's analysis of Plaintiff's credibility, therefore, does not
13   constitute reversible error.

14

15      **4.    The ALJ Did Not Err By Failing To Find Any Limitations Caused**
16           **By The Side Effects Of Plaintiff's Medication**.

17

18      Plaintiff's contention that the ALJ erred in failing to assess
19   properly the "side effects" of Plaintiff's medication is without merit.
20   When asked about the side effects of his medications, Parafon and
21   Darvocet, Plaintiff merely responded that these medications "[make] my
22   stomach [hurt] sometime[s]."   (A.R. 106.)   However, Plaintiff also
23   testified that he can mitigate this side effect by eating, which he
24   makes the effort to do.   (A.R. 55.)   There is no basis for finding
25   reversible error in this respect.
26   ///
27   ///
28   ///

**5.   <u>The ALJ's Failure To Address Mr. Henderson's Testimony Does Not Warrant Reversal</u>.**

Plaintiff lives with his cousin, a quadraplegic.  Eric Henderson, a nurse who cares for the cousin between the hours of 10:00 a.m. and 8:00 p.m, testified at the June 30, 1998 hearing.  Although Plaintiff asserts that Mr. Henderson provided "important testimony as to [Plaintiff's] exertional limitations" (Joint Stip. at 5), he is mistaken.  Henderson only testified as to his general observations of Plaintiff.  (A.R. 65-68.)  In particular, Henderson testified that: he "notices" that Plaintiff sits "on the average from 15 to 25 minutes" before getting up and "sitting on the couch about another 25/25 minutes"; he helps Plaintiff get up; Plaintiff lays more than he sits; Plaintiff watches television; and Plaintiff spends substantial time talking to his cousin.  (A.R. 65-68.)  Moreover, Mr. Henderson conceded his lack of knowledge as to Plaintiff's claimed pain and how it affects him, stating:  "*I don't know what type of pain he has*" and "*I don't know how long the pains are*."  (A.R. 67; emphasis added.)

Henderson, thus, provided no clear testimony regarding Plaintiff's limitations.  While Henderson's brief testimony confirmed Plaintiff's statements that he alternates between sitting and standing positions, a matter that was not in dispute, his testimony also contradicted Plaintiff's testimony that he does not watch television and does "nothing."  If there was any error in the ALJ's failure to acknowledge Henderson's testimony specifically, it was harmless, as the Court can confidently conclude that no reasonable ALJ considering this case would have reached a different conclusion had he or she expressly considered

23

1 and addressed Henderson's testimony.  *See* Stout v. Commissioner, 454

2 F.3d 1050, 1056 (9th Cir. 2006)(when an ALJ fails to discuss competent

3 lay testimony, a reviewing court cannot find harmless error "unless it

4 can confidently conclude that no reasonable ALJ, when fully crediting

5 the    testimony,    could    have    reached    a    different    disability

6 determination").

7

8 **B.    The ALJ Did Not Err In Rejecting Plaintiff's Treating Physician's**

9     **December 5, 1997 Opinion That Plaintiff Is "Unable To Work".**

10

11     Ordinarily, the opinions of a treating physician should be given

12 great, if not controlling, weight.  *See* Social Security Ruling 96-2p.

13 When the ALJ rejects the opinion of a treating physician, even if it is

14 contradicted, the ALJ may reject that opinion only by providing specific

15 and legitimate reasons for doing so, supported by substantial evidence

16 in the record.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); *see*

17 *also* Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)(ALJ erred by

18 rejecting the treating physicians' opinions and relying upon Social

19 Security examiners' opinions in finding that claimant's CFS had not

20 rendered her disabled).  Broad and vague reasons will not suffice for

21 rejecting the treating physician's opinion. McAllister v. Sullivan, 888

22 F.2d 599, 602 (9th Cir. 1989).

23

24     In addressing the records of Dr. Roback, Plaintiff's treating

25 doctor, the ALJ stated:

26

27     By March 1996, when [Plaintiff] came under the care of Dr.

28     Roback, he had already undergone physiotherapy, exercises,

24

injections, electrotherapy, ultrasound, traction, back support, rest, and a work restriction. The initial diagnosis was a lumbar spine injury with lower lumbar musculotendono-ligamentous involvement, right and left posterior joint damages, and suggestions of slight intervertebral disc deformity. At that time, [Plaintiff] indicated that symptoms were increased by walking or standing 30 minutes and markedly increased after 15 minutes. For sitting, the respective tolerances were 50 minutes and 60 minutes (Exhibit 4F). In June 1996, [Plaintiff] continued `to assert pain, but acknowledged that his symptoms were better with medication and therapy (id.). [Plaintiff] generally acknowledged that he had improved with treatments. By March 1997, Dr. Roback considered [Plaintiff's condition to be] permanent and stationary. Even on a subjective basis, [Plaintiff's] back pain was rated as constantly slight to intermittent, with the work activities of lifting, carrying, bending, stooping and squatting. [Plaintiff] was limited to work precluding heavy lifting, repeated bending, stooping and squatting (Exhibit 4F). [Plaintiff] was placed on [a] maintenance program, including the use of a TENS unit, which [Plaintiff] previously acknowledged was helpful (Exhibit 6F, discussion, supra.)

. . . .

On December 5, 1997, Dr. Roback indicated that [Plaintiff] was then receiving treatment for his orthopedic condition. Dr. Roback reiterated the MRI findings. He then

25

indicated that [Plaintiff] received only palliative relief from his treatment.  He opined that [Plaintiff] would not be able to return to work (Exhibit 5F).  As noted earlier, there were no additional medical documents or evidence linked to this update from Dr. Roback.  Dr. Roback had previously found [Plaintiff] capable of a wide range of work.  The undersigned has already discussed that [Plaintiff] was not a fully credible witness and she does find this change in opinion evidence, undoubtedly based upon [Plaintiff's] subjective input, to be persuasive.  Dr. Roback repeated his statement [that Plaintiff] would be unable to work for an indefinite period in December 1997 (Exhibit 5F).

(A.R. 18-19.)  Plaintiff contends that:  it was improper for the ALJ to have rejected Dr. Roback's statement in his December 5, 1997 report that Plaintiff is unable to work; and the ALJ improperly criticized this report as being based upon Plaintiff's subjective input.  (Joint Stip. at 12.)

A physician's opinion that a claimant is "unable to work" may invade on the province of the ALJ to determine a claimant's ultimate disability.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. . . .  A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); see also Batson, 359 F.3d at 1194-95; Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)(a treating physician's opinion "[is not] necessarily conclusive as

26

to . . . the ultimate issue of disability."). Thus, the ALJ was not required to accept Dr. Roback's December 1997 opinion that Plaintiff was "unable to work."

Furthermore, the ALJ correctly found that the record shows that there was *no* objective medical evidence indicating that Plaintiff's condition had changed between Dr. Roback's December 5, 1997 report, and his March 25, 1997 report (eight months earlier), opining that Plaintiff *could* work, albeit with exertional limitations (*viz.*, Plaintiff's "work capacity is limited to preclude heavy lifting, repeated bending, stooping and squatting"; and "a return to the [pre-injury] place of employment is appropriate if reasonable accommodations can be made to coincide with work restrictions"). Moreover, in that March 25, 1997 report, Dr. Roback opined that Plaintiff's disability was "permanent and stationary" as of June 1, 1995. (A.R. 277.) As no objective medical findings supported Dr. Roback's "change of heart," the ALJ's perception that the December 5, 1997 opinion appeared to be based only on Plaintiff's subjective complaints was not unreasonable. Indeed, that Dr. Roback apparently was motivated by personal concern for Plaintiff in his December 1997 opinion is evident, given his several references to Plaintiff's need for "financial assistance" and the physician's fear that, without it, Plaintiff will become "destitute." (A.R. 330-31.)

A treating physician's opinion unsupported by clinical findings, and which is premised on subjective complaints that the ALJ has properly found to be not credible, may be rejected. *See* Baylis v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005)(ALJ properly rejected a physician's opinion that was not supported by clinical evidence and was based on the

27

claimant's subjective complaints); *see also* <u>Matney v. Sullivan</u>, 981 F.2d 1016, 1019 (9th Cir. 1992)(it is appropriate for an ALJ reject the opinion of a treating physician if that opinion is conclusory, brief and unsupported by clinical findings).   The ALJ expressly cited these reasons for rejecting Dr. Roback's December 1997 conclusion that Plaintiff cannot work.   The ALJ committed no error in doing so.

To the extent that Plaintiff complains that the ALJ's discussion of Dr. Roback's records *in toto* is vague and incomplete (Joint Stip. at 12), aside from Dr. Roback's December 5, 1997 opinion that Plaintiff is "unable to work for an indefinite period," Plaintiff does not identify any opinion or limitation expressed by Dr. Roback that the ALJ rejected. The ALJ's rejection of the December 1997 opinion was quite specific and, for the reasons set forth above, was legitimate, clear, and convincing. Accordingly, no reversible error exists.

## C.   **The ALJ Did Not Err In Assessing Plaintiff's Claimed Mental Impairment, Hernia, Headaches, And Hemorrhoids.**

Plaintiff asserts that the ALJ failed to address adequately, and to develop the record fully regarding, his mental impairment. (Joint Stip. at 17-18.)   Plaintiff further complains that the ALJ failed to address, and to develop the record fully regarding, his alleged hernia, hemorrhoid, and headache impairments.   (*Id.* at 19-20.)

### 1.   **Plaintiff's Mental Impairment**

Plaintiff contends that the ALJ improperly relied on the report of

28

Dr. Moran, a consulting psychologist, and improperly rejected the findings of Dr. Baker, a consulting physician, as not being sufficiently objective. (Joint Stip. at 17.) Plaintiff further contends that the record needs to be developed regarding his mental impairment, and the case should be remanded for the ALJ to conduct a hearing to elicit testimony from a medical expert regarding Plaintiff's mental limitations. (*Id.* at 17-18.)

When the opinion of an examining physician is uncontroverted, the ALJ must provide clear and convincing reasons, supported by substantial evidence of record, for rejecting it. When an examining physician's opinion is contradicted by that of another examining physician, the opinion may be rejected for specific and legitimate reasons that are based on substantial evidence of record. *See, e.g.,* Batson, 359 F.3d at 1195; Tonapetyan, 242 F.3d at 1148-49; Lester, 81 F.3d at 830-31.

The Commissioner has an affirmative duty to develop the record, even if the claimant is represented by counsel. Brown v. Heckler, 713 F.2d 441, 442-43 (9th Cir. 1993); 20 C.F.R. § 404.1512(e) (duty to re-contact treating physician); *see also* 20 C.F.R. § 404.1519a(b) (listing situations requiring a consultative examination, such as a conflict, inconsistency, ambiguity, or insufficiency in the evidence). "The ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005)(*citing* Tonapetyan, 242 F.3d at 1150).

29

In discussing the July 23, 1998 report of Dr. Moran, the ALJ stated:

> The undersigned finds that any emotional overlay is of limited significance. As noted, there was no initial allegation of a mental overlay, nor was there a history of treatment until the recent past. In July 1998 consultative psychological evaluation by Dr. Moran, [Plaintiff] was described as alert and compliant. He was fully oriented. He had some limitations in concentration, attention and memory. He was considered mildly depressed. [Plaintiff's] responses appeared affected by his discomfort level. The primary diagnosis was probably depression, not otherwise specified, mild in degree. Dr. Moran opined that [Plaintiff] evidenced only mild cognitive and emotional limitations regarding his ability to learn a simple, repetitive skill and adapt to minimal changes in the work environment. [Plaintiff] did appear to be withdrawn, which could affect his overall ability to relate to others and to adapt to minimal changes. Dr. Moran suggested that [Plaintiff] might have some difficulty sustaining pace and focus and may have some difficulty maintaining a regular schedule, which she related to [Plaintiff's] discomfort level (Exhibit 8F).

(A.R. 21.)

In discussing the November 9, 1998 report of Dr. Baker, the ALJ stated:

[Plaintiff] underwent psychiatric consultation by Dr. Baker in November 1998.  The mental status examination and [Plaintiff's] express pain symptomatology were similar to that expressed by Dr. Moran.  Dr. Baker diagnosed an adjustment disorder with mixed anxiety and depressed mood, now chronic, and perhaps characterized as mood disorder, not otherwise specified.  The depression stemmed from chronic pain and the financial, personal and social consequences of not earning a living (exhibit 9F).  The undersigned finds no impressive psychiatric signs from this report which supports a disabling mental component.  She reiterates that [Plaintiff] is not prescribed medications for emotional concerns.

(A.R. 21.)

The ALJ ultimately found that Plaintiff had "emotional" impairments that "restricted [him] to simple work."  (A.R. 23.) In determining Plaintiff's mental residual functional capacity, the ALJ explained: "Primarily based upon Dr. Moran's report, the undesigned will restrict the claimant to simple, or unskilled work tasks.  These tend to involve repetitive work processes, where absolute focus and attention [are] not necessarily crucial."  (A.R. 22.)

As described previously, in her July 23, 1998 report, Dr. Moran did not find that Plaintiff was unable to work due to his mental health problems but, rather, found only that Plaintiff had "mild cognitive and emotional limitations regarding his ability to learn a simple repetitive skill and adapt to minimal changes in the work environment" and "is

capable of learning a simple, repetitive skill." (A.R. 359.)   With respect to his social functioning and ability to focus, Dr. Moran explained that:  "[Plaintiff] does continue to interact with others and can maintain fair focus"; and Plaintiff's "[n]eurovegetative signs are mild."  (*Id*.)   Although Dr. Moran did note other possible mental problems that could or might limit Plaintiff in the future -- *e.g.*, that Plaintiff's social withdrawal "*could*" affect his ability to relate and adapt and he "*may* have difficulty maintaining a regular schedule" because of a compromised ability to concentrate and focus -- she did not find any other specific, present limitations that were impacting Plaintiff's ability to work as of the date of her evaluation. (A.R. 359-60; emphasis added.)

Thus, the ALJ's finding that Plaintiff's mental health impairments limited him to "simple work" was based on substantial evidence and consistent with Dr. Moran's report. *See, e.g.*, <u>Macri v. Chater</u>, 93 F.3d 540, 544 (9th Cir. 1996)(ALJ did not improperly reject treating doctors' opinions which were consistent with and subsumed within the ALJ's determination that the claimant was capable of performing a "wide range of light work").  Furthermore, as the ALJ explained, her mental residual functional capacity finding, which limited Plaintiff to unskilled or simple tasks, adequately encompassed Dr. Moran's description of potential focus and concentration problems. *See* 20 C.F.R. § 404.1568(a) ("Unskilled work [is] work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time[,] . . . a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.")

With respect to the ALJ's discussion of Dr. Baker's opinion, Plaintiff mistakenly contends that the ALJ "rejected" Dr. Baker's November 9, 1998 opinion. Instead, as quoted above, the ALJ found Dr. Baker's opinion to be consistent with Dr. Moran's opinion, noting that Dr. Baker's "examination" and "[Plaintiff's] express pain symptomatology" were similar to Dr. Moran's findings, and Dr. Baker's report demonstrates no "disabling" mental component. This is correct. Although Dr. Baker diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood, and thoroughly detailed the symptoms reported to him by Plaintiff, Dr. Baker did not note any limitations on Plaintiff's ability to work or conclude that Plaintiff was "disabled" by his mental health problems. Thus, the ALJ's finding regarding Plaintiff's mental residual functional capacity is consistent with, and does not constitute a rejection of, Dr. Baker's opinion. *See* Macri, 93 F.3d at 544.

Plaintiff has not cited any ambiguity or inadequacy in the record regarding Plaintiff's mental impairment that required its further development. Because the ALJ's mental residual functional capacity finding is supported by substantial evidence, it is not necessary to remand this case for further development of the record with respect to Plaintiff's claimed mental impairment, as Plaintiff requests. After the June 30, 1998 hearing, the case was remanded by ALJ Lang for an additional administrative hearing following the evaluation of Plaintiff's mental health impairment, in light of Plaintiff raising a mental health impairment, for the first time, at that hearing. (A.R. 15, 130.) In addition, ALJ Lang left open the record to allow Plaintiff's counsel to submit additional evidence from Dr. Butler,

Plaintiff's treating psychologist.  (A.R. 90.)  Following the June 30, 1998, the record was supplemented with the reports of three physicians -- Dr. Baker, Dr. Moran, and Dr. Butler -- regarding Plaintiff's mental impairment.[5]  Thus, there was "adequate information" in the record upon which to base a mental residual functional capacity finding in this case, and the duty to develop the record was not triggered.

## 2.  **Plaintiff's Hernia, Hemorrhoids, And Headaches**

Plaintiff complains that the ALJ failed to address his allegedly documented impairments of chronic hernia syndrome, chronic hemorrhoid condition, and chronic headache syndrome.  (Joint Stip. at 19.)  The court notes that Plaintiff made no claim to the Commissioner that any of these three conditions constitute "impairments" which bear on his ability to work.  Rather, he has raised these asserted impairments for the first time on review.

As a threshold matter, Plaintiff's argument rests on several mischaracterizations of the record.  Plaintiff's representation that he "testified as to his chronic hemorrhoid condition (TR 73)" is plainly false.  There is no page "TR 73" in the record; A.R. 73 consists of his

---

[5]      Plaintiff appropriately does not challenge the ALJ's rejection of the opinion of Dr. Butler, which consisted only of a check the box form in which the psychologist indicated that Plaintiff has moderate limitations in various categories.  (A.R. 408-11.)  Dr. Butler advised the Commissioner that:  Plaintiff has been referred to his office at the request of Plaintiff's counsel; the psychologist had not conducted any testing; and his assessment form was based purely on his observations of Plaintiff.  (A.R. 407.)  The ALJ properly rejected this opinion as lacking any supporting objective evidence and, to the extent it was predicated on Plaintiff's subjective complaints, found it to be not credible.  (A.R. 21-22.)

counsel's argument (which does not mention hemorrhoids); and Plaintiff did not testify elsewhere that he suffers from hemorrhoids, much less that any such problem is "chronic."   Plaintiff provides no record support for his assertion that the evidence showed he has received "continued treatment for his chronic hemorrhoid problem," and the Court has divined none.   As to his hernia, Plaintiff's assertion that the medical evidence showed "chronic pain in the left growing [presumably, groin] area" also is inaccurate, as the cited portion of the record indicated that Plaintiff reported experiencing "infrequent" pain in his left groin area that was "associated" with his back problems; no mention was made of a hernia issue.   (A.R. 270.)

Although the ALJ did not expressly mention Plaintiff's hernia, he fully discussed Plaintiff's lumbar problems following his June 1995 work injury before finding that Plaintiff had "severe" musculoskeletal impairments and was limited to "light" work with further postural limitations during the relevant time period.   (A.R. 18, 23.)   Even assuming, as he now asserts, that Plaintiff continues to experience "discomfort in [the] left testicle area" following his hernia surgery in 1996, Plaintiff fails to indicate any limitations arising from such discomfort for which the ALJ failed to account or which the ALJ improperly rejected. *See* <u>Burch v. Barnhart</u>, 400 F.3d 676, 681-82 (9th Cir. 2005)(ALJ did not err by failing to discuss the effects of the claimant's impairment of obesity and its combined effect on her other impairments, as there was no showing that the claimant's obesity caused any functional limitations or exacerbated any other impairments).   Thus, Plaintiff's assertion of error based on his "chronic hernia syndrome" is unavailing.

The records of Plaintiff's physicians contain scant reference to Plaintiff's asserted headaches and hemorrhoids. The record indicates that, while Plaintiff had problems with hemorrhoids prior to his alleged onset date, any problems he experienced from hemorrhoids were largely behind him as of August 2, 1995, his alleged onset date. Although Plaintiff informed several examining physicians that he had had hemorrhoid surgery in 1989 (A.R. 341, 254, 355), the only reference to any problem with hemorrhoids that Plaintiff reported following his last insured date was Plaintiff's statement to Dr. Roback, in March 1997, that they had "flared up again" (A.R. 272). Because this condition does not appear to be chronic, and even Plaintiff does not indicate how his hemorrhoids would have limited his ability to work during the relevant time period, the ALJ was not required to address or include any limitations resulting from Plaintiff's hemorrhoids in determining his residual functional capacity. *See* <u>Burch</u>, 400 F.3d at 681-82.

Similarly, although Plaintiff testified at the hearing that he suffers from severe headaches daily (A.R. 117-18), Plaintiff never mentioned them to his treating physicians. The only reference to such headaches in the records are Plaintiff's reports of headaches to two consulting physicians, namely, Dr. Baker and Dr. Shlens, after his claim had been filed. (A.R. 364 -- Plaintiff informed Dr. Baker that he had suffered from migraine headaches since 1996, twice daily to every other day, and that his headaches are "severe" and "make his eyes water"; 368 -- Plaintiff told Dr. Shlens that he "experience[d] headaches," which he attributed to stress.) The ALJ found such testimony by Plaintiff to be not credible, a finding which was not error. Thus, the ALJ was not required to address or include any

limitations arising from Plaintiff's claimed headaches in determining his residual functional capacity.   Moreover, as the record as to such headaches was neither ambiguous nor inadequate in this respect, the ALJ did not have a duty to develop it.   <u>Webb</u>, 433 F.3d at 687; *see also* 20 C.F.R. § 404.1519a(b).[6]

**D.   <u>Plaintiff's Arguments Regarding The Grids And The Questioning Of The Vocational Expert Are Unavailing</u>.**

Plaintiff asserts as his seventh issue that the ALJ's alleged reliance on the Medical Vocational Guidelines (the "Grids") to establish the presence of jobs Plaintiff could do was improper, because Plaintiff has non-exertional limitations and severe pain.   (Joint Stip. at 21-22.) Plaintiff mischaracterizes the ALJ's decision.   As discussed below, the ALJ utilized a vocational expert to determine whether any occupations exist in significant numbers in the national economy which Plaintiff could perform, and relied upon the Grids only as a "framework."   (A.R. 22.)

Plaintiff further contends that the ALJ's hypothetical question to the vocational expert was inadequate, because the vocational expert was asked only two hypothetical questions limiting Plaintiff to "light" work.   Plaintiff argues that he had additional non-exertional impairments, consisting of further "mental restrictions," that did not

---

[6]      The Court notes that, as a sixth issue, Plaintiff alleges that the ALJ failed to consider his physical and mental health problems in combination.  (Joint Stip. at 21.)  This meritless assertion warrants no further discussion, as it is flatly belied by the ALJ's analysis and her inclusion of exertional and non-exertional limitations, including restricting Plaintiff to simple work due to his mental limitations.

1  allow him to perform the full range of "light" work and which should

2  have been provided to the vocational expert. (Joint Stip. at 24.)

3

4      "If the assumptions in the hypothetical are not supported by the

5  record, the opinion of the vocational expert that claimant has a

6  residual working capacity has no evidentiary value." <u>Gallant v.</u>

7  <u>Heckler</u>, 753 F.2d 1450, 1456 (9th cir. 1984). Thus, in posing a

8  hypothetical to a vocational expert, the ALJ must accurately reflect all

9  of the claimant's limitations. <u>Embrey v. Bowen</u>, 849 F.2d 418, 422-24

10  (9th Cir. 1987).

11

12      At the October 5, 1999 hearing, the ALJ provided the following

13  hypothetical question to the vocational expert: "If we have a

14  hypothetical individual who's limited to light work, no repetitive or

15  frequent bending, stooping, squatting, climbing, crawling, or balancing,

16  and limited to simple tasks, would [he] be able to perform any [jobs

17  other than his prior work]?" (A.R. 121-22.) The vocational expert

18  identified several jobs that fit that profile, such as housekeeper,

19  garment bagger, and electrode cleaner. (A.R. 122.) This hypothetical

20  question properly took into consideration the only mental, non-

21  exertional impairment found by the ALJ, *i.e.,* that Plaintiff was limited

22  to performing simple tasks. The ALJ was not required to include in the

23  hypothetical the allegations he found to be not credible.

24

25      The ALJ committed no reversible error in her use of the Grids or

26  her hypothetical question to the vocational expert.

27

28

**E.** **Plaintiff's Receipt Of Social Security Benefits Following The ALJ's Decision In This Case Does Not Show That Plaintiff Was Disabled During The Period Of Disability In This Case.**

Plaintiff notes that he was awarded benefits pursuant to the Commissioner's May 6, 2002 letter, based on a claimed onset date of November 29, 2001. (Joint Stip. at 25.) Plaintiff contends that this May 6, 2002 decision was the "correct one" and shows that he should have been found disabled in this case. (*Id.*)

In the Appeals Council's February 25, 2003 letter denying Plaintiff's request for review of the ALJ's decision in this case, the Appeals Council specifically addressed this issue, stating: "[we] considered the fact that since the date of the Administrative Law Judge's decision, you were found to be under a disability beginning December 30, 2000, based on the application you filed on May 1, 2002; however, [we] found that this information does not warrant a change in the Administrative Law Judge's decision [issued on March 10, 2000]." (A.R. 4.)

Here, the ALJ adjudicated this case from Plaintiff's alleged onset date, August 2, 1995, "through the date of [the] decision," March 10, 2000. Plaintiff subsequently was granted disability benefits based on Plaintiff's application for benefits for a period beginning on December 30, 2000 -- nine months _after_ the ending date of Plaintiff's claimed disability in this case. The fact that Plaintiff was deemed disabled during a subsequent period does not demonstrate that the ALJ committed reversible error in not finding Plaintiff to be disabled _preceding_ that

date.   *Cf*.   Bruton v. Massanari, 268 F.3d 824, 827 (9th Cir. 2003)(claimant's argument that his case should be remanded in light of the award of benefits based on his second application was unpersuasive, because the second application involved different medical evidence, a different time period, and a different age classification, and the decision awarding benefits was not inconsistent with the ALJ's previous denial of benefits).

**CONCLUSION**

For all of the foregoing reasons, the Court finds that the Commissioner's decision is based on the correct application of the proper legal standards and is supported by substantial evidence, and that neither reversal of the ALJ's decision nor remand is warranted. Accordingly, IT IS ORDERED that Judgment shall be entered affirming the decision of the Commissioner of the Social Security Administration.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and for Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 29, 2006

                                        /s/
                              _____
                              MARGARET A. NAGLE
                              UNITED STATES MAGISTRATE JUDGE

40